UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THEY YAM,<br><br>Plaintiff,<br><br>v.<br><br>JO ANNE B. BARNHART, Commissioner of<br>Social Security,<br><br>Defendant. | Civil No.    06cv0528-W (CAB)<br><br>**REPORT AND RECOMMENDATION<br>TO DENY PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT AND GRANT<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT** |

## I.  Introduction

Plaintiff They Yam brings this action pursuant to 42 U.S.C. § 405(g)[1], to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") on her application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act ("Act").  The Commissioner found that Plaintiff was not under a disability as defined in the Act, and Plaintiff has filed this action challenging that decision.  Pursuant to Southern District of California Local Civil Rule 7.1(d)(1), the Court finds the parties' cross-motions for summary judgment can be decided on the papers and that no oral argument is necessary.  After careful

---

[1]  42 U.S.C. § 405(g) provides:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States. . . .  The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive.

consideration of the papers, the administrative record, and the applicable law, this Court **RECOMMENDS** that the Commissioner's decision adopting the ALJ's decision be **AFFIRMED**, Plaintiff's motion for summary judgment be **DENIED**, and Defendant's cross-motion for summary judgment be **GRANTED**.

## II.  Procedural History

Plaintiff applied for SSI benefits on June 10, 2002.  (Administrative Record ("AR") at 151-53).  Plaintiff alleged disability as of January 1, 1999.  (AR at 151.)  She claimed to experience stomach pain and itchiness, had an ovarian cyst, and overall got sick a lot, which made her unable to work.  (AR at 166.)  Further, she reported that she suffered abuse under Communist control in Cambodia.  (AR at 173.)  On August 23, 2002, the Social Security Administration ("Administration") determined Plaintiff was not disabled and denied her benefits.  (AR at 69-72.)  The Administration determined that Plaintiff's condition was not severe enough to keep her from working.  (AR at 69.)  Plaintiff requested reconsideration of her application, and the Administration denied benefits again after reconsideration.  (AR at 74-77.)

On November 15, 2002, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR at 78-79.)  On February 18, 2003, the ALJ conducted a hearing to consider the merits of Plaintiff's application.  (AR at 562-612.)  As a result of this hearing, the ALJ issued a written decision dated October 30, 2003, finding that Plaintiff was not disabled.  (AR at 102-22.)  Plaintiff disagreed with the ALJ's decision and requested an Appeals Council Review of the decision.  (AR at 123-31.)  On April 30, 2004, the Appeals Council remanded the case back to the ALJ for consideration of new and material evidence, submitted by Plaintiff's attorney.  (AR at 132-34.)

On September 8, 2005, the ALJ held a second administrative hearing.  (AR at 614-33.)  He then issued a new written decision on November 17, 2005, again determining that Plaintiff was not disabled as defined by the Act.  (AR at 13-65.)  Plaintiff requested review of the decision by the Appeals Council, and on January 20, 2006, the Appeals Counsel found no reason to review the ALJ's decision.  (AR at 5-7.)  The Appeals Council affirmed the ALJ's decision, which then became the final decision of the Commissioner.  (AR at 5.)

1   On March 13, 2006, after having exhausted all administrative remedies, Plaintiff initiated this

2   action challenging the proceedings in connection with the Commissioner adopting the ALJ's

3   decision.  [Doc. No. 1.]  On May 12, 2006, the Commissioner filed an answer to the complaint.

4   [Doc. No. 5.]  On July 26, 2006, Plaintiff filed a motion for summary judgment, requesting that the

5   Court reverse the ALJ's decision and remand for payment of benefits.  [Doc. No. 10.]  On August 9,

6   2006, Defendant filed a cross-motion for summary judgment, requesting that the ALJ's decision be

7   affirmed.  [Doc. No. 13-15.]

8   ### III.  Factual Background

9   **A.  Plaintiff's Testimony**[2]

10   Plaintiff was born on May 10, 1963.  She came to live in the United States in 1983.  (AR at

11   565.)  She had never attended school, except for two or three months of adult school to study English

12   in 1984.  (AR at 566-67.)  She did not speak or read any English, but did understand "very light, very

13   light English."  (AR at 567.)  At the February 18, 2002 administrative hearing, she testified that she

14   did not have a driver's license.  When pressed by the ALJ, she said she did have a driver's license,

15   but she believed it was expired.  (AR at 568.)  The ALJ then showed Plaintiff a copy of her driver's

16   license, which was issued April 25, 2000 and expired May 10, 2005.  (AR at 569.)

17   Plaintiff indicated that she last worked in 1986.  She explained that her job was "like

18   packaging, like put the balloon in a bag."  She stopped working when she became pregnant.  Since

19   then, she had not had a job, either full-time or part-time.  (AR at 571.)  Plaintiff testified that she

20   lived with her five children, ranging from four years old to 16 years old, and her boyfriend, who was

21   the father of three of her children.  (AR at 571-72.)  Her boyfriend was currently on disability, and

22   Plaintiff received AFDC.  (AR at 572.)

23   Plaintiff believed she could not work, because she was sick: "I got stomach ache.  I got

24   operation."  Plaintiff clarified that she had a hysterectomy sometime the previous year.  Plaintiff also

25   indicated that she had numbness in her right hand.  (AR at 573.)  The ALJ noted that Plaintiff had a

26   scar on her wrist, and Plaintiff explained that she hurt her wrist with a glass, because she was angry

27

28   [2] Plaintiff testified at both the February 18, 2003 and September 8, 2005 administrative hearings through an interpreter.

1   and wanted to hurt herself.  (AR at 573-75.)  The night that she hurt her wrist, she did not go to the

2   doctor, and she did not see a doctor until three weeks after the incident.  (AR at 575-77.)  The ALJ

3   asked Plaintiff to make a fist with her right hand and to open all her fingers, and Plaintiff was able to

4   perform both functions.  (AR at 577.)

5        Plaintiff also testified that she could not work, because she got headaches everyday and could

6   not sleep at night.  (AR at 578.)  Plaintiff indicated she also had pain in her chest (AR at 604) and

7   numbness in her knees, which made it difficult to walk (AR at 611).  She could walk for half an hour

8   and rest for 5-10 minutes before she could resume walking again.  (*Id.*)  In addition, she could stand

9   for only five or six minutes.  (*Id.*)  Plaintiff testified that she also had back pain sometimes, but it did

10  get better with medication.  (AR at 612.)  In addition, she did not like to work with other people,

11  because they got her upset, and she just wanted to hit them.  (AR at 578.)

12       In terms of providing care to her children, Plaintiff indicated that she washed their clothes,

13  fed them in the morning before they went to school, shopped for groceries once a week, cooked

14  about six days a week, and walked them to school about two to three days a week.  (AR at 580-81.)

15  She also cleaned her home, paid her bills, and "sometimes" washed the dishes.  (AR at 283-84.)

16       Plaintiff testified that she got angry and felt like killing herself once a week or sometimes

17  every two weeks.  She testified that the most recent incident in which she wanted to kill herself was

18  within the last couple of weeks, when she wanted to take a rope and tie it around her neck, but she

19  did not actually do it.  (AR at 590.)  Plaintiff also indicated she had "anger spells" two to three times

20  a month.  (AR at 593-94.)  She did not hear voices when no one was around.  (AR at 594.)  She did,

21  however, have nightmares, in which she would see ghosts in the house.  (*Id.* & AR at 599.)  Plaintiff

22  indicated she had never seen a doctor as a result of a suicide attempt.  (AR at 596.)  She insisted she

23  just wanted to hurt herself, but she did not actually do it.  (AR at 595.)

24       She described the torture she suffered in Cambodia as being hurt with a gun by some little

25  kids.  She was put in jail for taking a cucumber, and on the way to the jail, "those little kids" pointed

26  a gun on her back.  She indicated that she had not been cut or had any bones broken.  (AR at 601.)

27  However, they beat her with a gun for about half an hour, and she bleed through the mouth as a

28

result.  (AR at 602.)  After the beating, she was put in jail, and she was not beaten again during the year that she remained in jail.  (AR at 602-03.)

At the September 8, 2005 administrative hearing, Plaintiff reiterated much of the same physical complaints.  She testified that her physical problems included chest pains, stomachache and numbness in half of her body.  She could walk 10-20 minutes before she would have to rest for five minutes.  (AR at 625.)  She could stand for 5-10 minutes before she had to rest.  (AR at 626.)  She also explained that her asthma interfered with her daily living, because it caused her chest pain and coughing.  She also could not lie down for very long, because the asthma required her to stay upright.  The asthma also interfered with her ability to sleep, and she only slept about one to two hours each night.  (AR at 628.)  She also experienced neck and back pain, which she attributed to the beating she received with the gun back in Cambodia.  (AR at 628-29.)  She testified that she was depressed, had problems remembering things, and had nightmares two to three times a week that ghosts were hunting her.  (AR at 630.)  She also testified that she saw shadows at night and heard voices two to three times a week saying they wanted to kill her.  (AR at 631.)

**B.  Medical Evidence Presented**

**1.  Kittya Paigne Medical Group**

Plaintiff visited the Kittya Paigne Medical Group on and off starting in 1996.  (AR at 338-82.)  Plaintiff often reported ailments such as chest pain, a cough, and poor sleeping.  She complained of depression, fatigue, backache and poor sleeping on December 26, 2000.  (AR at 372.)  She returned on July 17, 2001, also complaining of depression, backache and poor sleeping.  In addition, she reported a cough, shortness of breath and vaginal discharge with itching for about a year.  (AR at 371.)  She returned a month later and reported that she was "doing well today," although she still had a cough.  (AR at 370.)  Plaintiff returned to the practice about every month thereafter, until May 2002.  (AR at 362-69.)  During this time, her chief complaints were a cough, headache and itching.  On May 7, 2002, she had a pelvic ultrasound, in which the doctor found a 10.4 centimeter heterogenous complex left pelvic mass and a three centimeter right ovarian cyst.  (AR at 355.)  In June 2002, the physician's assistant referred her to Loc Q. Nguyen, M.D. for chest

1   x-rays, because Plaintiff continued to complain of chest pain and coughing.  On June 7, 2002, Dr.

2   Nguyen found no evidence of TB, pneumonia or other abnormalities.  (AR at 341-42.)

3       **2.  Sharp Memorial Hospital**

4       Plaintiff had surgery at Sharp Memorial Hospital on July 16, 2002 to remove her left ovarian

5   cyst and for a hysterectomy.  (AR at 386-87.)  The cyst and fallopian tube were found to be benign.

6   (AR at 391-93.)

7       **3.  Mounir Soliman, M.D.**

8       At the request of the Department of Social Services, Plaintiff underwent a psychiatric

9   evaluation with Dr. Soliman on August 1, 2002.  (AR at 397-400.)  Plaintiff's chief complaint at the

10  evaluation was "depression."  She stated that she had been suffering from depression for the last

11  couple of years, and she seemed to believe that her physical problems were a manifestation of the

12  depression.  (AR at 397.)  She reported that she was currently taking Elavil for her depression and

13  pain, but she still reported sadness, decreased energy and decreased concentration.  (AR at 397-98.)

14  She was also taking "multiple medications" for her physical ailments.  (AR at 398.)

15      Dr. Soliman found that Plaintiff was alert and oriented to person, place and time.  Her

16  immediate, recent and remote memory appeared to be intact.  He believed her abstract thinking was

17  normal and her insight was good.  (*Id.*)  He noted that her mood was mildly depressed, and it

18  appeared that she had decreased sleep and decreased energy.  She had no suicidal or homicidal

19  ideations.  He diagnosed her with a mood disorder due to her general medical condition, and

20  assessed a global assessment functioning of 58[3].  (AR at 399.)

21      Dr. Soliman believed, from a psychiatric standpoint, Plaintiff was able to understand, carry

22  out and remember simple and complex instructions.  He believed she was able to interact with

23  co-workers, supervisors and the general public.  He also believed Plaintiff would have mild difficulty

24

25

26      [3]  A Global Assessment of Functioning score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations.

27  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 2000) ("DSM IV").  A GAF of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and

28  circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM IV at 32-34.

tolerating the stress related to work and work-like situations.  He concluded that her symptoms were treatable and manageable with the appropriate outpatient psychiatric treatment.  (AR at 400.)

### 4. Physical Residual Functional Capacity Assessment

On August 15, 2002, George G. Spellman, M.D., reviewed the medical records and conducted a Physical Residual Functional Capacity Assessment of Plaintiff.  (AR at 402-09.)  The doctor concluded that Plaintiff could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday; and sit (with normal breaks) for a total of six hours in an eight-hour workday.  (AR at 403.)  Dr. Spellman believed Plaintiff had unlimited ability to push and/or pull.  (*Id.*)  He did not believe Plaintiff had any postural limitations (e.g., climbing, balancing, stooping, kneeling, crouching and crawling).  (AR at 404.)  The doctor also concluded that Plaintiff had no manipulative, visual or communicative limitations.  (AR at 405-06.)  He did believe that she had some environmental limitations due to her history of asthma.  Specifically, she should avoid concentrated exposure to extreme cold, extreme heat, humidity and hazards such as machinery and heights.  (AR at 406.)  Dr. Spellman noted that Plaintiff had been treated for an ovarian cyst and had a history of asthma, but he did not believe the alleged impairments met or equaled the severity of the disability listings.  (AR at 407.)

### 5. Mental Residual Functional Capacity Assessment

On August 20, 2002, Gina M. Rivera-Miya, M.D. reviewed the medical records and conducted a mental residual functional capacity assessment of Plaintiff.  (AR at 427-29.)  Dr. Rivera-Miya believed Plaintiff had a mood disorder due to her general medical condition.  (AR at 415.)  The doctor did not believe Plaintiff was significantly limited in her understanding and memory, sustained concentration and persistence, social interaction or adaptation.  (AR at 427-28.)  The only areas in which the doctor believed Plaintiff was moderately limited was in her ability to understand and remember detailed instructions (AR at 427), her ability to carry out detailed instructions (*id.*), her ability to interact appropriately with the general public (AR at 428) and her ability to set realistic goals or make plans independently (*id.*).  The doctor believed Plaintiff could

06cv0528

sustain simple repetitive tasks with adequate pace and persistence, and she could adapt and relate to co-workers, but she could not work with the public.  (AR at 429.)

On September 12, 2002, H.N. Hurwitz, M.D., a board certified psychiatrist, reviewed the medical records and agreed with Dr. Rivera-Miya's assessment.  (AR at 431.)

### 6. The Union of Pan Asian Communities ("UPAC")

Plaintiff started visiting UPAC in October 2002, after she initially applied for SSI benefits. (AR at 440-47.)  The intern therapist taking her initial assessment reported that Plaintiff was referred by her husband for self-injurious behavior, such as hitting herself on the head with a wooden stick and pinching or bruising her arm one to two times a month.  Plaintiff reported suicidal ideations, depressed mood, feelings of hopelessness, poor sleeping and lack of appetite.  She also reported hallucinations of ghosts and skeletons in her house and flashbacks of torture she endured in Cambodia.  She indicated she had seen a psychiatrist once in August 2002[4].  She attempted suicide in 1999 by taking 5 bottles of Tylenol but was not hospitalized.  (AR at 440.)  She reported that she had been coughing up blood since 1999, which the intern therapist thought could possibly be TB.  (AR at 442.)  The intern therapist gave Plaintiff a GAF of 11[5], with the highest in the last year being 50. (AR at 443.)  When Plaintiff spoke to the intern therapist on October 10, 2002, she indicated she had plans to hang herself or use a knife to hurt herself, but on October 17, 2002, Plaintiff denied any suicidal ideation.  (AR 444.)

Plaintiff returned to UPAC on October 25, 2002, although it is not clear from the progress notes who she saw that day.  (AR at 437-39.)  Plaintiff reported that she had trouble sleeping, heard voices from a man and a woman telling her to come to them, had decreased appetite and was always

---

[4]  It appears from the record that this psychiatrist was Dr. Soliman, who conducted a psychiatric evaluation at the request of the Department of Social Services.

[5]  A GAF of 11-20 denotes "[s]ome danger of hurting self or others (e.g. suicide attempts without clear expectation of death; frequently violent; manic excitement)" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication (e.g., largely incoherent or mute)." DSM-IV at 32.

1   mad and upset.  The notes indicate that Plaintiff reported having no suicidal ideation but some

2   paranoid ideation.  The diagnosis given at this visit was major depression, with a GAF of 45[6].

3        The majority of the remaining records from UPAC are "medication management reports,"

4   which log the various medications Dr. Ronald Zappone prescribed to Plaintiff.  In September and

5   October 2003, Dr. Zappone prescribed Zyprexa.  (AR at 486-87.)  On both occasions, Plaintiff

6   reported the medication was helping, and she was sleeping better.  She received Zyprexa four more

7   times in 2004, along with Neucontin.  (AR at 485, 484, 556 & 483.)  The medication management

8   reports indicate that Plaintiff was sleeping better and was feeling more relaxed.

9        On August 29, 2005, Sunwook Kimbang, a therapist at UPAC, wrote a letter, in which she

10  reported that Plaintiff had been coming regularly to UPAC for individual therapy since October

11  2002.  Ms. Kimbang reported that Plaintiff had been diagnosed with major depressive disorder with

12  psychotic features, and that Plaintiff had been taking psychotropic medications on a daily basis since

13  then.  Ms. Kimbang also indicated that Plaintiff had been seeing Dr. Zappone, a staff psychiatrist at

14  UPAC, until September 2004, when she started seeing Dr. Henderson.  (AR at 535.)

15       On October 4, 2005, Plaintiff saw Ms. Kimbang to discuss setting goals for the next year.

16  Plaintiff complained of chest pain, coughing and numbness in her back.  She also indicated she was

17  having financial difficulties.  She denied any suicidal ideation, hallucinations or self-harming

18  behavior.  Ms. Kimbang helped Plaintiff to process her improvement and changes in terms of

19  maintaining her level of functioning for the past year and to set goals for the next year.  Plaintiff

20  indicated that she had been using cultural belief and spiritual ritual to help alleviate her symptoms

21  during the past year.  She appeared motivated for treatment and to keep working on her goals for the

22  next year.  Plaintiff reported that she still suffered from depressive and psychotic symptoms, but she

23  said she was compliant in taking her medications, and she was motivated to continue therapy.  (AR

24  at 551.)  Plaintiff's goals for the next year included improving communication and parenting skills;

25  continuing to check on her physical health; and continuing to apply for SSI.  (AR at 552.)

26

27  ─────────────────

28       [6]  A GAF of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional
    rituals, frequent shoplifting)" or "serious impairment in social, occupational, or school functioning (e.g.,
    no friends, unable to keep a job)."

**7. Harry C. Henderson, III, M.D.**

The administrative record contains progress notes from Plaintiff's visits with Dr. Henderson, dating from December 2002.  (AR at 517-32.)  Between December 2002 and March 2005, Plaintiff met with Dr. Henderson 14 times.  Sometimes, her visits were monthly for a four-month period, but then she would not see him again for six months.  Dr. Henderson's progress notes consist of one sheet of paper, handwritten with words such as "suicide," "plans," "hopeless," "helpless," "worthless," and "useless."[7]  For each visit, it appears he used a photocopy of this handwritten sheet of paper and marked the various words with a positive or negative sign.  He usually marked a negative next to "suicide" and "plans" or left those words blank.  He usually marked a positive next to the words "helpless" and "hopeless."

On February 8, 2003, Dr. Henderson provided a letter regarding Plaintiff's condition.  (AR at 432-33.)  Dr. Henderson indicated that he had been treating Plaintiff on a regular basis since April 2001[8].  He diagnosed Plaintiff with severe depression and post-traumatic stress syndrome resulting from her experiences as a Cambodian war refugee during the Pol Pot regime.  He gave Plaintiff a current GAF of 40[9].  (AR at 433.)  He noted that Plaintiff had a number of physical problems, which put her in chronic pain and worsened her mental problems.  He indicated that Plaintiff had attempted suicide in the previous year, which resulted in hospitalization.  He believed she was in need of individual therapy but could not afford the sessions, so she received group therapy at UPAC.  (AR at 432.)

Dr. Henderson reported that Plaintiff became quickly confused when asked to answer simple questions, showed a tendency toward excessive reaction to events, and suffered frequent syncopes and amnesia.  He also indicated that Plaintiff suffered auditory hallucinations and periods of

---

[7]  Not all of the words are legible.

[8]  The record, however, only contains treatment notes starting December 2002.

[9]  A GAF of 31-40 denotes "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM-IV at 32.

06cv0528

depersonalization, her mood was dysphoric, and she suffered from memory loss.  He believed Plaintiff's ability to concentrate was poor, due to her pain, depression and recurrent obsessive thoughts.  (AR at 432.)  Dr. Henderson reported that Plaintiff showed little improvement despite treatment with numerous antidepressant and anti-psychotic medications.  He believed the combination of Plaintiff's physical ailments and her severe depression prevented her from gainful employment.  (AR at 433.)

On December 18, 2003, Dr. Henderson provided another letter regarding Plaintiff's condition, which he called a "follow-up psychiatric evaluation" to address some of the issues raised by the ALJ[10].  (AR at 471-74.)  His review of treating notes indicated that Plaintiff continued to suffer severe depression and post-traumatic stress disorder dating from her war experiences in Cambodia.  Although she suffered from a number of physical ailments, he believed the depression and post-traumatic stress syndrome was Plaintiff's most severe impairment and had not improved with psychiatric care.  He disagreed with Dr. Soliman's assessment that Plaintiff was able to work and perform simple repetitive tasks.  (AR at 471.)

Dr. Henderson did not believe there existed an effective treatment for Plaintiff's psychiatric condition. At best, he believed medication would make her life more tolerable, but she could not be cured to the point where she could work.  (AR at 472.)  He believed that Plaintiff had difficulty dealing with the mental effort it took to undergo daily pressures, including tasks one would be required to perform in a job.  He gave Plaintiff a GAF of 45, higher than what he gave her in February 2003.  (AR at 474.)

Dr. Henderson disagreed with the ALJ's conclusion that Plaintiff was lying.  Instead, he believed that she was confused, erratic and moody.  He believed her mental disability was permanent and stationary since at least 2000.  Based on his review of treating notes, medical documents and Plaintiff's own reports, he believed Plaintiff had marked restrictions of activities of daily living, marked difficulties in maintaining social function and deficiencies in concentration.  He believed her ability to adapt to stresses in the workplace was severely limited, and the combination of her physical

---

[10]  It was this letter that prompted the Appeals Council to remand the matter to the ALJ.

1   problems, coupled with her psychosis, depression and post-traumatic stress syndrome would prevent

2   her from gainful employment.  He did not believe she would be able to compete in the workplace

3   and was in need of continued therapy for at least 24 months.  (AR at 474.)

4       **8.  Colonial Corner Medical Group**

5       Plaintiff visited the Colonial Corner Medical Group between January 2003 and February

6   2005.  (AR at 492-514.)  In 2003, she visited the medical group about once a month, complaining of

7   coughing, headache, the flu and a rash.  (AR 500-07, 510-14.)  She had a chest x-ray on June 20,

8   2003, with no acute changes since her last x-ray a year ago[11].  (AR at 514.)  On October 1, 2003, she

9   had an ultrasound of her abdomen, which revealed a normal gall bladder and biliary tree.  (AR at

10  510.)  In 2004, Plaintiff visited the medical group about six times, complaining of a cough, back

11  and chest pain, and a stomachache.  (AR at 495-99.)  On January 11, 2005, Plaintiff had a chest x-ray at

12  the request of Nadine Sidrick, M.D.  The x-ray revealed a stable chest with right upper lobe old

13  granulomatous disease.  (AR at 508.)

14      In a letter dated January 23, 2003, Dr. Sidrick reported that she treated Plaintiff for right thigh

15  numbness, osteoarthritis, asthma, right hand weak grasp due to injury and laceration resulting from a

16  suicide attempt, and depression and post-traumatic stress syndrome.  The doctor noted that Plaintiff

17  spent years under Communist rule doing hard labor, because her husband was a former soldier.  (AR

18  at 434.)  She believed that Plaintiff was very limited in her residual functional capacity due to her

19  physical and mental impairments.  Dr. Sidrick also believed Plaintiff had a weak grasp in her right

20  hand, was restricted from unprotected heights, being around moving machinery, exposure to marked

21  changes in temperature and humidity, driving automotive equipment and exposure to dust, fumes

22  and gases.  (AR at 435.)

23      In another letter dated August 23, 2005, Dr. Sidrick reported that, due to the severity of her

24  physical and mental impairments, Plaintiff was limited in her residual functional capacity.  Dr.

25  Sidrick assessed that Plaintiff could only stand or walk four hours a day with frequent breaks every

26

27

28      [11]  A chest x-ray from June 27, 2002 revealed a normal sized heart with mild aortic tortuosity;
and fibrocalcific scarring in the right upper lobe of the lung but no evidence of active pulmonary disease.
(AR at 460.)

half hour due to her osteoarthritis.  In addition, the doctor repeated her conclusion that Plaintiff was restricted from unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity and driving automotive equipment.  (AR at 534.)

**9.  James Santiago Grisolia, M.D.**

Dr. Grisolia saw Plaintiff on January 7, 2003 for evaluation of a two- to three-year history of holoacranial throbbing headaches, accompanied by photophobia and sonophobia.  The headaches occurred two to three times per week and were of such disabling severity that Plaintiff had to lie down.  According to the doctor, Plaintiff had a history of "very substantial" psychiatric impairment, including auditory and visual hallucinations, suicide attempts, and physical violence.  The doctor believed she had a very severe depressive psychosis with daily hallucinations and that the severity of her psychosis was "clearly completely disabling." (AR at 470.)

Dr. Grisolia followed up with Plaintiff on February 19, 2003.  Plaintiff had been taking Depakote at the doctor's request, but without any benefit for the headaches she had been having.  Dr. Grisolia thought he could try to increase the dose of Depakote, but he noted that in light of the "profound psychiatric pathology," complaints like headaches were minimally treatable.  He believed Plaintiff's current level of disability should be considered long-term or permanent.  (AR at 540.)

In a letter dated July 6, 2004, Dr. Grisolia reported that Plaintiff continued to have depressive psychosis including paranoid hallucinations, which was related to prior torture by the Khmer Rouge with resultant post-traumatic stress disorder.  He believed the diffuse body pains were related to the very substantial prior history of torture, and he anticipated that Plaintiff would continue to be totally disabled on a permanent basis.  (AR at 539.)

In another letter dated August 17, 2005, Dr. Grisolia reported that Plaintiff returned with continued headaches that occurred one to two times a week.  Similar to her visit in January 2003, she reported the headaches were of such intensity that she had to lie down.  She also had post-herpetic neuralgia, a skin condition that Dr. Grisolia indicated was even more severe and caused a continuous pain.  She had the neuralgia for more than a year, and it was strongly presumed to be chronic and would limit her ability to concentrate due to chronic pain.  According to Dr. Grisolia, these

1  disabilities, in addition to her psychiatric disorder, which were severely disabling and resulted in

2  permanent disability.  (AR at 538.)

3  **10.  David A. DiCicco, Ph.D.**

4  Dr. DiCicco, a clinical psychologist, conducted a psychological evaluation of Plaintiff on

5  February 16, 2003.  (AR at 461-63.)  Plaintiff reported to Dr. DiCicco that in Cambodia, she was

6  captured and kept in a prison camp from ages 11 to 12, because she tried to steal a cucumber.  While

7  in jail, she was hit and generally mistreated.  (AR at 461.)  Dr. DiCicco administered only the

8  performance section of the Wechsler Adult Intelligence Scale-III, due to language limitations.

9  Plaintiff's performance I.Q. was 55, a score which placed her below the first percentile.  Dr. DiCicco

10  believed this was most likely a low estimate of her true I.Q.  Her intellectual functioning had been

11  compromised due to a number of variables, which included no knowledge of English, depression,

12  past trauma and stress, and a lack of any kind of formal education.  Dr. DiCicco's diagnostic

13  impression was that Plaintiff had major depressive episode 296.3, but he ruled out post traumatic

14  stress disorder.  (AR at 462.)  He gave her a GAF of 40.  At the testing session, Dr. DiCicco

15  observed that Plaintiff showed little affect, was unresponsive and only showed glimmers of

16  relatedness when her son came to her side.  He did not believe Plaintiff could function in the world

17  of work, because she could not speak English, had low energy, was a volatile person, and seemed to

18  be very depressed.  (AR at 463.)

19  **11.  Milton Lessner, Ph.D.**

20  Dr. Lessner consulted with Plaintiff on May 7, 2004 and conducted a psychological

21  assessment at the request of her physicians.  (AR at 541-49.)  Dr. Lessner noted that her demeanor at

22  the consultation was reserved, distant, stoic and repressed.  Her stare was blank and spatial, and she

23  seemed to have difficulty when required to focus.  (AR at 541.)  Dr. Lessner reported that Plaintiff's

24  medications included Albuterol, for bronchial asthma; Doxycline, for skin bacteria; Serzone, for

25  mental depression; Geodon, for psychosis; Pepcid, for excessive hydrochloric stomach acid; Flonase,

26  for nasal allergy; Norvasc, for hypertension and migraine; Zyprexa, for psychotic disorders; and

27  Tylenol, for pain relief.  (AR at 544.)

28

1   Dr. Lessner administered a number of tests, including the Bender Gestalt Test, Trail Making

2   Part A, Test for Nonverbal Intelligence-3, Wechsler Memory Test-Revised, and Mental Status test.

3   (AR at 544-45.)  Dr. Lessner believed the tests revealed Plaintiff had withdrawal tendencies,

4   emotional instability, and depression.  (AR at 545.)  He also believed Plaintiff had serious cognitive

5   impairment.  He assessed her I.Q. to be 83, slightly below average, which he believed could be

6   attributed to her limited education and hardships.  (AR at 546.)  Dr. Lessner also believed the tests

7   indicated that Plaintiff had serious memory impairment.  (AR at 547.)

8   Dr. Lessner noted that Plaintiff was "rather stagnant," and beyond ministering to her personal

9   hygiene, she did not have the energy or agility to tend to household chores.  Her husband helped with

10   the cleaning and shopping, and her 17-year-old daughter managed the cooking, housework, laundry,

11   and drug dispensation.  Her hospital experience, when she received a hysterectomy, appeared to

12   exacerbate her mental condition, causing her undue dysphoria and morbidity.  (AR at 543.)  Dr.

13   Lessner believed Plaintiff required day and night supervision.  He concluded Plaintiff would be

14   prone to emotional outbursts at work, would have difficulty with communication in the workplace,

15   could not carry out simple instructions, and was not able to maintain her own finances.  He assessed

16   her at a GAF of 40.  (AR at 544.)

17   **C.  Vocational Evidence Presented**

18   Gloria Lassoff testified at the administrative hearing as a vocational expert.  (AR at 605-10.)

19   The ALJ presented two hypotheticals encompassing various aspects of Plaintiff's physical and

20   mental limitations.

21   The first hypothetical assumed an individual of the same age, education and work history as

22   Plaintiff, able to lift and carry 25 pounds frequently and 50 occasionally; able to sit, stand and walk

23   for at least 6 hours in an 8 hour work day; avoiding concentrated exposure to chemicals, dust, fumes

24   and gas and extreme heat, cold and humidity; and mentally limited to simple repetitive tasks with no

25   interpersonal contact with the public.  (AR at 605.)  Ms. Lassoff found that, given those limitations,

26   there would be work that such a person could do.  (AR at 606.)  Such jobs at the medium exertional

27   level included assembler/general laborer (1,900 locally, 285,000 nationally); and laundry laborer

28   (2,300 locally, 600,000 nationally).

The second hypothetical assumed the same age, education, and work experience in the previous hypothetical but with the additional limitation to the light exertional level.  That is, the person was limited to lifting and carrying 10 pounds frequently and 20 occasionally; sitting, standing and walking for at least 6 hours in an 8 hour day; and could not have close or frequent interpersonal contact with supervisors or coworkers.  (AR at 607.)  With those limitations, Ms. Lassoff determined that there would be work available for Plaintiff.  Such work included production assembler (1,100 locally, 150,000 nationally); garment folder (1,000 locally, 500,000 nationally); and sample clerk (900 locally, 190,000 nationally).

Plaintiff's attorney asked Ms. Lassoff if Plaintiff were unable to use her dominant right hand for any repetitive motion, would she still be able to do the jobs mentioned.  Ms. Lassoff indicated that she would need to use her hand up to two-thirds of the time, so such a person would have difficulty performing these jobs.  (AR at 608.)  Further, Plaintiff's attorney asked Ms. Lassoff if Plaintiff could not complete tasks two-thirds of the time, whether she would be able to perform any of the jobs mentioned.  Ms. Lassoff indicated that the person could not sustain employment under those circumstances.  (AR at 610.)

**D.  ALJ's Findings**

After a discussion of the evidence in the record, the ALJ determined that Plaintiff was not under a "disability," as defined in the Social Security Act, at any time from her protective filing date of May 31, 2002 to the date of the ALJ's decision, November 17, 2005.  (AR at 63.)  Therefore, Plaintiff was not entitled to SSI benefits.  (AR at 65.)  In making his determination, the ALJ found that Plaintiff's subjective allegations were not credible, because she was very often inconsistent in her claims.  (AR at 57-61.)  The ALJ gave some weight to all medical opinions in the record and gave Plaintiff the maximum reasonable benefit of the doubt.  He indicated that he gave significant weight to the state agency physicians, but he ultimately assessed more limiting functional restrictions than they did.  He limited Plaintiff to light, rather than medium work, and added psychiatric limitations.  (AR at 37.)

Specifically, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her protective filing date of May 31, 2002.  (AR at 16.)  Then, the ALJ found that Plaintiff had the

following medically determinable impairments that in combination were considered "severe" under the Social Security Act and regulations: asthma; allergic rhinitis; history of tuberculosis with residual lung scarring in the right upper lobe; status post hysterectomy and bilateral salpingo-oophorectomy in July 2002; laceration, dominant right wrist, with no residual dysfunction lasting for 12 continuous months; occasional headaches, relieved with Tylenol; hypertension, gastroesophageal reflux disease; and major depressive disorder, stable on medication, with psychotic features "by dubious self report." The ALJ did not believe Plaintiff's self-reported symptoms that led to the diagnosis of post-traumatic stress disorder ("PTSD"), and therefore, he did not find that Plaintiff suffered from PTSD. (AR at 32.) The ALJ also did not find "chronic back pain" or "fainting spells" as medically determinable impairments, because they were symptoms, not impairments. Despite Plaintiff's various impairments, the ALJ found that these impairments, alone or in combination, did not meet or equal an impairment listed in the regulations. (AR at 35.)

The ALJ determined that Plaintiff retained the residual functional capacity to perform work activity at the light exertional level, with the following nonexertional limitations: avoiding concentrated exposure to pulmonary irritants such as chemicals, dust, fumes, and gases, and extremes of heat, cold or humidity; and mentally limited to simple repetitive tasks, with no close or frequent interpersonal contact with supervisors, co-workers or the public. (AR at 36.) Because Plaintiff had not worked for more than 15 years, the ALJ then assessed whether she could sustain employment on a regular and continuing basis in jobs that existed in significant numbers in the national economy. Taking into account Plaintiff's age, education, work history and residual functional capacity, the ALJ found that Plaintiff could perform the following jobs, which existed in significant numbers in the national economy: production assembler, garment folder, and sample clerk. (AR at 62.) Because Plaintiff could perform and sustain work in jobs existing in significant numbers in the national economy, the ALJ concluded Plaintiff was not "disabled" within the meaning of the Social Security Act. (AR at 63.)

///

///

///

1

### IV.  Discussion

2

**A.  Legal Standard**

3

The Social Security Act authorizes payment of SSI benefits to individuals who have an

4

"inability to engage in any substantial gainful activity by reason of any medically determinable

5

physical or mental impairment which can be expected to result in death or which has lasted or can be

6

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).

7

The disabling impairment must be so severe that the claimant is not only unable to do her previous

8

work, but, considering age, education, and work experience, cannot engage in any kind of substantial

9

gainful work that exists in the national economy.  § 1382c(a)(3)(B).

10

The Commissioner makes this assessment by a five-step analysis.  First, the Commissioner

11

determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not

12

disabled.  20 C.F.R. § 416.920(b).  Second, the Commissioner determines whether the claimant has a

13

"severe impairment or combination of impairments" that significantly limits the claimant's physical

14

or mental ability to do basic work activities.  If not, the claimant is not disabled.  § 416.920(c).

15

Third, the medical evidence of the claimant's impairment is compared to a list of impairments that

16

are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of

17

the listed impairments, benefits are awarded.  § 416.920(d).  Fourth, if the impairment meets or

18

equals one of the listed impairments, the Commissioner determines whether the claimant can do his

19

past relevant work.  If the claimant can do his past work, benefits are denied.  § 416.920(e).  If the

20

claimant cannot perform her past relevant work, the burden shifts to the Commissioner.  In step five,

21

the Commissioner must establish that the claimant can perform other work.  § 416.920(f).  If the

22

Commissioner meets this burden and proves that the claimant is able to perform other work that

23

exists in the national economy, then benefits are denied.  § 416.966.

24

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial

25

review of a final agency decision of the Commissioner.  42 U.S.C. § 405(g).  The scope of judicial

26

review is limited, however, and the Commissioner's denial of benefits "will be disturbed only if it is

27

not supported by substantial evidence or is based on legal error." *Brawner v. Sec'y of Health &*

28

1   *Human Servs.*, 839 F.2d 432, 433 (9th Cir. 1988) (citing *Green v. Heckler*, 803 F.2d 528, 529 (9th

2   Cir. 1986)).

3       Substantial evidence means "more than a mere scintilla" but less than a preponderance.

4   *Sandqathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997). "[I]t is such relevant evidence as a

5   reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews v.*

6   *Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). The court must consider the record as a whole,

7   weighing both the evidence that supports and detracts from the Commissioner's conclusions.

8   *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). If the evidence

9   supports more than one rational interpretation, the court must uphold the ALJ's decision. *Allen v.*

10  *Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). When the evidence is inconclusive, "questions of

11  credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Sample*

12  *v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

13      Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions,

14  the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing

15  the evidence and reaching his or her decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir.

16  1978). Section 405(g) permits a court to enter a judgment affirming, modifying, or reversing the

17  Commissioner's decision. 42 U.S.C. § 405(g). The reviewing court may also remand the matter to

18  the Commissioner for further proceedings. *Id.*

19  **B. Plaintiff's Claim**

20      Plaintiff argues several grounds for reversal of the ALJ's decision, some of which are

21  repetitive of each other. Therefore, the Court consolidates Plaintiff's arguments into the following

22  five points: 1) the ALJ erred in rejecting Plaintiff's testimony, because there was no basis for finding

23  Plaintiff was not credible; 2) the ALJ improperly rejected the opinions of Plaintiff's treating

24  physicians; 3) Plaintiff met the 12.04 and 12.06 listing for disability; 4) the ALJ's hypotheticals to

25  the vocational expert were inadequate and improper; and 5) Plaintiff was disabled due to a

26  combination of impairments. The Court considers each of these arguments below.

27  ///

28  ///

**1. ALJ properly discredited Plaintiff's testimony**

Plaintiff contends that the ALJ erroneously rejected her testimony by accusing her of lying with no basis for such accusations.  (Pl.'s Mem. 25-28.)  The ALJ has the authority to determine whether a claimant's testimony is credible.  *See Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991).  If an ALJ finds a claimant's testimony not credible, "the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).  "If the ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing."  *Id.* at 959.  In determining the credibility of a claimant's testimony, the ALJ may consider: 1) the claimant's reputation for lying, prior inconsistent statements and other testimony from the claimant that appears less than candid; 2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; or 3) the claimant's daily activities.  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

Here, the ALJ did not find Plaintiff's subjective testimony credible, and he pointed to specific instances of inconsistent statements by Plaintiff to support his conclusion.  The ALJ indicated that at the first administrative hearing on February 18, 2003, Plaintiff lied under oath about having a driver's license.  (AR at 57.)  She denied ever having a driver's license until the ALJ presented a photocopy of her unexpired driver's license to her.  (AR at 401 & 568.)  For the ALJ, this untruth went beyond just the issue of whether Plaintiff had a driver's license.  Plaintiff testified that she did not speak or read any English.  (AR at 567.)  Such testimony was incongruous with the California Vehicle Code, which required that a person be able to read and understand simple English used in highway traffic and direction signs in order to obtain a driver's license.  The ALJ reasoned, "The ritual of the driver's test, both written and practical, is an American rite of passage and is common knowledge.  Issuance of a California driver's license to the claimant shows that she does, in fact, have the mental ability to learn the rules required to pass a driver's test, to demonstrate for a DMV examiner the practical ability to apply those rules to the road, as well as the mental ability to learn enough English to demonstrate for a DMV examiner that she can read English highway traffic and directional signs."  (AR at 58.)

1    The ALJ pointed out other areas in which Plaintiff was very often inconsistent in her claims,

2    noting, "The stark contrast between what she says she can do, and what she had, in fact, done,

3    reflects very poorly on her veracity." (AR at 59.) He did not believe Plaintiff's claims that she was

4    so psychologically scarred by the "torture and abuse" she suffered under the Pol Pot regime that she

5    could not work, because when she first arrived in the United States, she could and did work for two

6    years. (AR at 58-59.) Her claim that she could not do anything around the house (AR at 181-83 &

7    218-19) was directly contradicted by her testimony at the administrative hearing that she did

8    participate extensively in her children's care by doing things such as washing their clothes, shopping

9    for groceries, cooking about six days a week, and walking them to school (AR at 580-84). (AR at

10    59.) She also told Dr. Soliman that she was able to cook, clean, shop, run errands, take care of

11    personal hygiene, take care of financial responsibilities, knew how to drive a car, and was able to

12    focus on her daily activities. (AR at 399.)

13    Plaintiff argues that the ALJ "penalized" her for trying to care for her family. (Pl.'s Mem.

14    35.) While the Ninth Circuit has pointed out the limitations of using a claimant's daily activities in

15    determining whether she is able to work, the court has also acknowledged that "the ALJ may reject a

16    claimant's symptom testimony if the claimant is able to spend a substantial part of her day

17    performing household chores or other activities that are transferable to a work setting." *Smolen*, 80

18    F.3d at 1283 n.7 (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Consistent with *Smolen*,

19    the ALJ, taking all the evidence together, found that Plaintiff, and not her teenage daughters, ran her

20    household of seven, meaning she could function substantially more than she claimed. (AR at 60.)

21    Despite her allegations of debilitating aches and pains, the ALJ noted that Plaintiff was never

22    referred for special diagnostic studies, orthopedic evaluation or pain management. (AR at 61.)

23    Further, despite her allegations of profound depression and attempted suicide, the ALJ found no

24    persuasive evidence that Plaintiff had ever actually tried to end her life. (*Id.*) While several of her

25    doctors repeatedly stated that she had multiple suicide attempts, there was no medical evidence in the

26    record of Plaintiff being taken to the hospital after a suicide attempt. Further, while several of her

27    doctors believed she hurt her right wrist during a suicide attempt, Plaintiff testified at the

28    administrative hearing that she hurt her wrist because she was mad at her children. (AR at 573-75.)

1    It appeared the injury was the result of an accident rather than a suicide attempt.  At neither of the

2    administrative hearings did Plaintiff mention any suicide attempts, even when asked by the ALJ.

3    Plaintiff specifically stated that she thought about ending her life but did not act upon those thoughts.

4    (AR at 595.)

5        Plaintiff also argues that the ALJ used "flimsy pretext" to discredit her testimony.  (Pl.'s

6    Mem. 25.)  Plaintiff claims the ALJ accused her of lying simply because she could not accurately

7    recall the details of her imprisonment by the Pol Pot regime, something that occurred 30 years ago.

8    Her inability to recall the details of her imprisonment, however, was not the only reason the ALJ

9    provided for rejecting her testimony.  Rather, he pointed to a number of inconsistencies in her

10   testimony and in what she related to her doctors.  Plaintiff argues that, given her history of mental

11   illness, the inconsistencies in her testimony were due to her memory problems, and it was improper

12   for the ALJ to discredit her testimony.  (Pl.'s Mem. 36-37.)  However, the ALJ did not discredit

13   Plaintiff's testimony simply based on her inconsistent statements.  Aside from the fact that Plaintiff

14   lied under oath about having a driver's license, the ALJ pointed out that having a driver's license

15   was evident of the fact that Plaintiff had the mental wherewithal to obtain the driver's permit, take

16   the driving test, and read simple traffic signs.  The ALJ also pointed to specific incidences where

17   Plaintiff's claims of debilitating pain and depression were inconsistent with the treatment she

18   received.  Therefore, Plaintiff's argument that the ALJ simply used Plaintiff's memory problems to

19   discredit her testimony is without merit.

20       Plaintiff's citation to *Higbee v. Sullivan*, 975 F.2d 558 (9th Cir. 1992) is inapposite.  In

21   *Higbee*, the plaintiff had been receiving SSI benefits, but was then denied benefits because he

22   refused to provide information verifying his continued residence in the United States.  *Higbee*, 975

23   F.2d at 561.  The Ninth Circuit noted that the difficulty of the case was that the plaintiff had been

24   receiving SSI benefits, because he had paranoid schizophrenia, and his failure to cooperate appeared

25   to be due to the very thing that made him eligible for SSI in the first place.  *Id.*  The court further

26   noted that the plaintiff was not a "mere applicant for benefits":  "He had already been found by the

27   [Administration] to meet all the eligibility requirements.  As an [SSI] recipient, he had a property

28

1   interest in the continued receipt of such benefits." *Id.* at 562.  Such is not the case here.  There has
2   never been a determination that Plaintiff was eligible for benefits.

3       Plaintiff further argues that the ALJ was biased against her.  (Pl.'s Mem. 17.)  The Court has
4   thoroughly reviewed the record, including the transcripts from both administrative hearings and the
5   ALJ's decision, and the Court cannot find an instance where the ALJ expressed biased toward
6   Plaintiff.  Plaintiff arrived late to both hearings, and the ALJ patiently waited for her.  (AR at 564 &
7   616.)  The ALJ did appear to express some impatience with Plaintiff's attorney, who did not have
8   Plaintiff's list of medications prepared (AR at 585 & 632), but even "expressions of impatience,
9   dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and
10  women . . . sometimes display," do not establish bias.  *Rollins v. Massanari*, 261 F.3d 853, 858 (9th
11  Cir. 2001) (citation omitted).  "ALJs and other similar quasi-judicial administrative officers are
12  presumed to be unbiased.  This presumption can be rebutted by a showing of conflict of interest or
13  some other specific reason for disqualification."  *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th
14  Cir.1999) (citation and internal quotations omitted).  Plaintiff has failed to show that the ALJ's
15  behavior, in the context of the case as a whole, was so extreme as to render fair judgment impossible.
16  *See Rollins*, 261 F.3d at 858.

17      The ALJ concluded, in light of the record as a whole, Plaintiff was not credible (AR at 61),
18  and his findings are sufficiently specific to permit the Court to conclude that the ALJ did not
19  arbitrarily discredit Plaintiff's testimony.  *See Byrnes v. Shalala*, 60 F.3d, 639, 641-42 (9th Cir.
20  1995); *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) (" ALJ must identify what testimony is not
21  credible and what evidence undermines the claimant's complaints").  Further, the findings are
22  supported by substantial evidence.  Plaintiff has failed to show that the ALJ erred with respect to his
23  credibility findings.  As such, the ALJ's credibility determination will not be disturbed.  *See Thomas*,
24  278 F.3d at 958-59.

25  ///
26  ///
27  ///
28  ///

1    **2.  ALJ properly rejected the opinions of Plaintiff's treating physicians**

2          Plaintiff argues that the ALJ improperly rejected the opinions of Drs. Henderson, Grisolia,

3    and Sidrick[12].  Plaintiff also takes issue with the ALJ's rejection of the opinion of Tuan Le, a

4    physician's assistant, who was working under the auspices of Dr. Larry Suk.  (Pl.'s Mem. 13-17.)

5          The Ninth Circuit distinguishes among the opinions of three types of physicians: (1) those

6    who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

7    (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

8    physicians).  *Lester*, 81 F.3d at 830.  The ALJ must give the medical opinion of a treating physician

9    "special weight," because a treating physician "is employed to cure and has a greater opportunity to

10   know and observe the patient as an individual."  *Andrews*, 53 F.3d at 1041 (citation omitted);

11   *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989).  However, the treating physician's opinion

12   on the ultimate issue of disability is not necessarily conclusive.  *Matney v. Sullivan*, 981 F.2d 1016,

13   1019 (9th Cir. 1992).  The ALJ may disregard the treating physician's opinion if the ALJ sets forth

14   "specific, legitimate reasons . . . based on substantial evidence."  *Rodriguez*, 876 F.2d at 762.  The

15   ALJ can meet this burden of substantial evidence by "providing a detailed summary of the facts and

16   conflicting clinical evidence, along with a reasoned interpretation thereof."  *Id.*  Finally, the ALJ

17   need not accept an opinion of a treating physician if it is "conclusory and brief and unsupported

18   by clinical findings."  *Matney*, 981 F.2d at 1019.  Here, the ALJ went through the medical records

19   submitted by each of the physicians:

20                    **a.  Dr. Henderson**

21         Dr. Henderson diagnosed Plaintiff with severe depression and post-traumatic stress syndrome

22   resulting from her experiences during the Pol Pot regime in Cambodia.  He did not believe that

23   Plaintiff could function in the workplace, given her mental and physical problems.  The ALJ did not

24   give Dr. Henderson's opinions controlling weight, because they were not supported by the record

25   and were inconsistent with other substantial evidence in the record, including the opinions of Drs.

26

27         [12]  Plaintiff also lists Dr. Zappone as one of the doctors whose opinion the ALJ rejected, but the
     ALJ actually did not reject Dr. Zappone's opinions or the treating notes he provided.  In fact, the ALJ
28   noted that Dr. Zappone's treating notes often contradicted the opinions of Drs. Henderson, Grisolia and
     Sidrick.

1  Soliman, Rivera-Miya and Hurwitz.  (AR at 42.)  Dr. Henderson's treating notes revealed that

2  Plaintiff's visits were irregular.  (AR at 22.)  Plaintiff saw Dr. Henderson 14 times between

3  December 2002 and March 2005.  Such irregularity was inconsistent with the profound illness she

4  claimed to experience.  (AR at 43.)

5       The ALJ also noted that while Dr. Henderson's letters indicated that Plaintiff had suicidal

6  ideation, the doctor never made a contract for personal safety with her nor referred her to crisis

7  resources.  (AR at 22.)  Further, Dr. Henderson indicated Plaintiff had attempted suicide in 2002,

8  which resulted in hospitalization (AR at 432), but there was no evidence in the record that Plaintiff

9  was hospitalized.  There was no reference in the treating notes about incarceration or torture during

10  the Pol Pot regime or depression she suffered from having to endure the torture.  (AR at 38.)  The

11  ALJ also pointed out that if Plaintiff had been beaten and tortured, there should be some physical

12  evidence of that, but there was no documented physical evidence of scars or broken bones.  (AR at

13  38.)

14       The treating notes from Plaintiff's visits with Dr. Henderson were scant at best.  The notes

15  consist of a one-page photocopied list of words, and Dr. Henderson would mark a plus or minus sign

16  next to some words.  (AR at 517-32.)  The ALJ observed these notes did not record any diagnosis or

17  mental status examination.  (AR at 22.)  The Appeals Council directed the ALJ to review Dr.

18  Henderson's second letter, dated December 18, 2003, in reconsidering his decision.  (AR at 132-34.)

19  The ALJ noted that, despite the additional documents submitted by Dr. Henderson, there was still no

20  record of his having ever performed any of the standard clinical tests for cognitive function or a

21  mental status examination.  (AR at 42.)

22       Further, Dr. Henderson's opinion that Plaintiff seemed to be worsening since her

23  hysterectomy was contradicted by Dr. Zappone's treating notes, which indicate that Plaintiff had

24  been improving on Zyprexa.  (AR at 43.)  Dr. Zappone's treating note for January 22, 2004, a month

25  after Dr. Henderson's letter, indicated that Plaintiff reported she was doing "mostly well," that her

26  anxiety, paranoia and hallucinations had diminished and that her memory was good.  (AR at 485.)

27  Throughout 2004, Plaintiff reported to Dr. Zappone continued improvement in her mental and

28  physical condition.  (AR at 44, 483-85 & 556.)  Although Dr. Henderson reported that Plaintiff was

1    still haunted by her past in Cambodia, she never reported such problems to Dr. Soliman or Dr.

2    Zappone.  (AR at 44.)

3         Much of Dr. Henderson's assessment was based on Plaintiff's subjective complaints (AR at

4    474), which the ALJ properly discredited.  As such, the ALJ was permitted to give less weight to Dr.

5    Henderson's opinion.  Disregarding a doctor's opinion because it was premised on a claimant's

6    subjective complaints, which the ALJ had already properly discounted, constitutes a specific,

7    legitimate reason for rejecting the opinion of a treating physician.  *Fair*, 885 F.2d at 605 (citing

8    *Brawner*, 839 F.2d at 433-34).  The ALJ accordingly did not err in this regard.

9         Plaintiff contends that the ALJ did not give any legitimate reasons for rejecting Dr.

10   Henderson's findings, except for "ad hominem attacks."  (Pl.'s Mem. 13.)  To the contrary, the ALJ

11   gave a detailed nine-page analysis of Dr. Henderson's opinions and specifically discussed each

12   portion of Dr. Henderson's two letters and how they were contradicted either by Plaintiff's own

13   accounts, by Dr. Henderson's own treating notes, or by treating notes of her other doctors.  (AR at

14   37-46.)  The ALJ even stated, "I do not doubt that Dr. Henderson is a very kind physician who

15   strives to help his patients."  (AR at 46.)  Such detailed analysis and acknowledgment of Dr.

16   Henderson's concern toward his patients do not amount to "ad hominem attacks."  Plaintiff also

17   argues that the report of a psychiatrist should not be rejected due to absence of substantial

18   documentation, unless there are other reasons to question the diagnostic technique, citing *Hartman v.*

19   *Bowen*, 636 F. Supp. 129, 131-32 (N.D. Cal. 1986).  In this case, the ALJ did provide many other

20   reasons for giving Dr. Henderson's opinion less weight, and this Court finds these reasons were

21   specific, legitimate reasons.

22                    **b. Dr. Grisolia**

23        Plaintiff also disagrees with the ALJ's assessment that Dr. Grisolia was only an examining

24   physician.  (Pl.'s Mem. 15-16.)  Plaintiff contends that Dr. Grisolia was a treating physician.  An

25   acceptable treating source is one who has provided the claimant with medical treatment or evaluation

26   and either has, or has had, an ongoing treatment relationship with the plaintiff.  20 C.F.R. § 416.902.

27   If the frequency and nature of treatment or evaluation by an acceptable medical source is typical for

28   the plaintiff's condition, the court will consider that relationship to be an ongoing treatment

relationship.  *Benton v. Barnhart*, 331 F.3d 1030, 1035-36 (9th Cir. 2003).  Plaintiff asserts that the ALJ's classification of Dr. Grisolia as an "examining physician" contravenes Ninth Circuit law, but does not explain exactly how it does that.  (Pl.'s Mem. 15.)  The Ninth Circuit has acknowledged that it would be impractical to draw a bright line between what constitutes a treating physician and a non-treating physician.  *Benton*, 331 F.3d at 1038.  "Rather, the relationship is better viewed as a series of points on a continuum reflecting the duration of the treatment relationship and the frequency and nature of the contact."  *Id.*  Plaintiff saw Dr. Grisolia four times between January 2003 and August 2005 for her headaches.  Assuming Dr. Grisolia were a treating physician, the ALJ provided legitimate and specific reasons, supported by substantial evidence in the record, for rejecting his opinion.  *Lester*, 81 F.3d at 830.

First, Dr. Grisolia saw Plaintiff for evaluation of her complaints of debilitating headaches, which were based on Plaintiff's subject complaints and for which there was no prior history of complaints or treatment.  (AR at 49.)  Although Plaintiff told Dr. Grisolia that she had experienced these debilitating headaches for two to three years, the ALJ noted that Plaintiff's first complaint of headaches to Dr. Sidrick was in July 2003, seven months after her first visit with Dr. Grisolia.  (AR at 502.)  Further, although she complained of photophobia, phonophobia, nausea and vomiting, she never complained of any of these symptoms to Dr. Sidrick.  (AR at 49.)  She also only complained of headaches one other time, in October 2003, but denied having photophobia and did not report having nausea or vomiting.  (AR at 501.)

Further, in her disability report in September 2002, Plaintiff reported that she spent most of her time listening to Cambodian music, which is in stark contrast to her report to Dr. Grisolia that she had sonophobia due to her headaches.  (AR at 220.)  Dr. Sidrick only prescribed Tylenol for Plaintiff's headaches, and she never prescribed any analgesic medication at all.  (AR at 50.)  Finally, the ALJ noted that Dr. Grisolia assumed Plaintiff's wrist injury was from a suicide attempt, but during her testimony at the administrative hearing, she never indicated that her wrist injury was from a suicide attempt.  (AR at 50-51.)  Dr. Grisolia made the diagnosis that Plaintiff had a psychiatric disorder that resulted in permanent disability, but as the ALJ noted, the doctor was not a psychiatrist.

1   (AR at 52.)  These finds are legitimate, specific reasons for rejecting his opinion and are supported

2   by substantial evidence in the record.

3            **c.  Tuan Le, P.A.**

4            Plaintiff also argues that physician's assistant Tuan Le should be considered an acceptable

5   treating medical source, because he was acting under the supervision of Dr. Suk and Dr. Paigne.

6   (Pl.'s Mem. 16-17.)  Plaintiff insists that "a plain reading" of 20 C.F.R. 416.913(a)(6) and 20 C.F.R.

7   416.913(e)(3) indicates that a physician assistant working in conjunction with a physician constitutes

8   an acceptable medical source.  The Court cannot agree, however, because 20 C.F.R. 416.913(a)(6)

9   does not exist in the regulations, and 20 C.F.R. 416.913(e)(3) is inapplicable to the question of what

10  is an acceptable medical source.  Further, Plaintiff cites to *Gomez v. Chater*, 74 F.3d 967 (9th Cir.

11  1996) for the same proposition.  In *Gomez*, the Ninth Circuit held that the opinion of a nurse

12  practitioner could be viewed as an acceptable medical source where it was clearly established that

13  she was acting as an agent of the doctor.  *Gomez*, 74 F.3d at 971.  That holding depended in part on

14  20 C.F.R. 416.913(a)(6), a provision, which, as noted earlier, no longer exists in the regulations[13].

15  As the regulations read now, Mr. Le is not an acceptable medical source, and the ALJ's assessment

16  that Mr. Le's opinions were largely irrelevant to a disability determination was not in error[14].

17           **d.  Dr. Sidrick**

18           Finally, Plaintiff takes issue with the ALJ's rejection of Dr. Sidrick's opinion.  (Pl.'s Mem.

19  16-17.)  While the ALJ believed Dr. Sidrick to be Plaintiff's primary care physician, he did not

20  believe Plaintiff had all the problems that Dr. Sidrick reported her to have.  In Dr. Sidrick's letter,

21  dated January 23, 2003, she reported she had been treating Plaintiff for right thigh numbness,

22  osteoarthritis, asthma, right hand weak grasp due to injury and laceration resulting from a suicide

23

24  ──────────────

25       [13]  Even under the holding in *Gomez*, it is not clear from the record that Mr. Le was acting as an
     agent for either Dr. Suk or Dr. Paigne.  The reports provided by Mr. Le does not contain the evaluation
26   or signature of an acceptable medical source.  *See Gomez*, 74 F.3d at 971 ("Moreover, 20 C.F.R. §
     416.913(a)(6) states that '[a] report of an interdisciplinary team that contains the evaluation and
27   signature of an acceptable medical source is also considered acceptable medical evidence . . .'").

28       [14]  Under 20 C.F.R. 416.913(d)(1), a physician's assistant can provide evidence of the severity
     of a claimant's impairments but is still not considered an acceptable medical source to establish a
     medically determinable impairment.

06cv0528

1   attempt, and depression and post-traumatic stress syndrome.  (AR at 434.)  The ALJ pointed out that

2   this letter was written after Dr. Sidrick had seen Plaintiff once.  (AR at 46.)  At that first appointment

3   on January 2, 2003, Plaintiff complained of coughing and the only treatment prescribed was an

4   NSAID, Sulindac.  (AR at 507.)

5          The treating notes from the first visit indicate that Plaintiff had full range of motion

6   throughout her entire spine, gait was intact except for heel gait on the right, and blood pressure was

7   normal.  (AR at 507.)  Dr. Sidrick diagnosed depression; history of asthma; old granulomatous

8   disease; bronchitis, resolving; and osteoarthritis.  (AR at 507.)  The January 23, 2003 letter, on the

9   other hand, reported that Plaintiff was very limited in her residual functional capacity due to her

10  physical and mental impairments.  (AR at 435.)  Dr. Sidrick also mentioned a suicide attempt, which

11  is not documented in her treating notes at all.  (AR at 434.)  The ALJ believed these inconsistencies

12  made her opinions about Plaintiff's functional limitations questionable.  (AR at 47.)  Further,

13  although Dr. Sidrick reported that Plaintiff was unable to use her hands for any repetitive motion, the

14  ALJ noted that there was no objective clinical or laboratory evidence in the record that Plaintiff had

15  issues with her right wrist or hand, nor did Dr. Sidrick's treating notes document any complaints of

16  problems with Plaintiff's right wrist or hand.  (AR 48.)  These were specific, legitimate reasons for

17  rejecting Dr. Sidrick's opinion.

18         Plaintiff argues, by rejecting the opinions of her treating physicians, the ALJ improperly

19  acted as a medical expert.  (Pl.'s Mem. 28.)  To the contrary, it is the ALJ's job to determine issues

20  of credibility and resolve conflicts in medical testimony.  *Saelee v. Chater*, 94 F.3d 520, 522 (9th

21  Cir. 1996) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)).  As the Ninth Circuit

22  noted in *Saelee*, the ALJ is permitted to examine the evidence before him as a whole and determine

23  that a doctor's testimony is not credible.  *Id.* at 522-23.  Further, the court in *Saelee* noted that it was

24  also permissible for the ALJ to reject a doctor's testimony when it is based on a claimant's

25  subjective allegations, which the ALJ has found to be untrustworthy.  *Id.* at 523.  As such, the ALJ

26  did not abuse his discretion in rejecting or giving less weight to the opinions of Drs. Henderson,

27  Grisolia, and Sidrick.

28

1    Plaintiff further argues, by rejecting the opinions of her treating physicians, the ALJ

2 improperly relied on the opinions of non-treating sources.  (Pl.'s Mem. 30.)  The ALJ, however, may

3 reject the opinion of a treating physician in favor of the conflicting opinions of an examining

4 physician if the ALJ makes findings setting forth specific, legitimate reasons based on substantial

5 evidence in the record.  *Thomas*, 278 F.3d at 957.  In addition, the opinion of a non-examining

6 physician may constitute substantial evidence when it is supported by, and consistent with, other

7 evidence in the record.  *Andrews*, 53 F.3d at 1041.  Where, as here, the record contains conflicting

8 medical evidence, the ALJ is charged with determining credibility and resolving the conflict.

9 *Thomas*, 278 F.3d at 956-57.  The ALJ properly explained his reasons for affording the opinions of

10 Drs. Henderson, Grisolia, and Sidrick little weight, and the ALJ's findings were based on substantial

11 evidence in the record.  The ALJ was justified in relying on the opinions and findings of fact by Dr.

12 Soliman, who examined Plaintiff; Dr. Rivera-Maya, the state agency psychiatric consultant, who

13 reviewed the evidence and concluded that Plaintiff's mental impairments were not severe; and Dr.

14 Spellman, the state agency physician consultant, who reviewed the evidence and concluded that

15 Plaintiff's physical impairments were not severe.  *See Andrews*, 53 F.3d at 1037.  Contrary to

16 Plaintiff's assertion that the ALJ relied solely on Dr. Soliman's opinion in making his determination,

17 the ALJ did rely on other evidence in the record, such as treating notes, Plaintiff's own testimony,

18 and the opinions of the state agency doctors.

19    Further, many of the conclusions Drs. Henderson, Grisolia, and Sidrick were based on

20 Plaintiff's own subjective complaints, which the ALJ had properly discredited.  When an

21 individual's subjective complaints are contradicted and found not fully to be credible, a physician's

22 repetition of the complaints likewise is not credible.  *Barker v. Sec'y of Health & Human Svcs.*, 882

23 F.2d 1474, 1477 (9th Cir. 1989); see also Fair, 885 F.2d at 605 (ALJ's specific statement that he

24 rejected claimant's treating physician's opinion because the physician's opinion was based on the

25 claimant's complaints of pain, which the ALJ disbelieved, was specific and legitimate).

26 ///

27 ///

28 ///

- 30 -

1    **3.  ALJ properly found that Plaintiff's medically determinable impairments did not**

2         **meet or equal any listing in the regulation**

3         The ALJ found that Plaintiff's impairments were "severe" but did not meet or medically

4    equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (AR at 35.)

5    Plaintiff argues that her mental impairments do meet the criteria for listing 12.04(A)(1) and 12.06.

6    (Pl.'s Mem. 4.)  Under the regulations, when a claimant's impairment matches an impairment on the

7    list, the claimant is automatically entitled to disability benefits, regardless of the claimant's

8    individual ability to work.  20 C.F.R. § 416.920(d)[15].

9         Listing 12.04, affective disorders, is "[c]haracterized by a disturbance of mood, accompanied

10   by a full or partial manic or depressive syndrome.  Mood refers to prolonged emotion that colors the

11   whole psychic life; it generally involves either depression or elation."  20 C.F.R. Part 404, Subpart P,

12   Appendix 1, § 12.04.  In order to meet the required level of severity for these disorders, a claimant

13   must satisfy the requirements of 12.04(A) and (B), or the requirements of 12.04(C).  *Id.*

14        Listing 12.06, anxiety-related disorders, is characterized by anxiety as "either the

15   predominant disturbance or [anxiety] is experienced if the individual attempts to master symptoms;

16   for example, confronting the dreaded object or situation in a phobic disorder or resisting the

17   obsessions or compulsions in obsessive compulsive disorders."  20 C.F.R. Part 404, Subpart P,

18   Appendix 1, § 12.06.  In order to meet the required level of severity for these disorders, a claimant

19   must satisfy the requirements of 12.06(A) and (B), or the requirements of 12.06(A) and (C).  *Id.*

20        Even though the regulations require that a claimant meet the requirements of only one listing

21   to be considered disabled, Plaintiff argues that her mental impairments meet the requirements for

22   both listings.  As support for her argument that she meets the criteria for both listings, Plaintiff cites

23   to the opinions of Drs. Zappone, Henderson, DiCicco, Lessner, Grisolia, and Sidrick.  As discussed

24   above, however, the ALJ properly gave less weight to the opinions of many of these doctors.

25

26

27        [15]  Plaintiff cites to 20 C.F.R. § 404.1520(d), but that section of the Social Security Act governs
     "Federal Old-Age Survivors and Disability Insurance."  Because Plaintiff is applying for Supplemental
28   Security Income, the Court cites to 20 C.F.R. § 416, the portion of the Social Security Act that governs
     SSI benefits.

1      Further, the record does not contain evidence to support Plaintiff's argument that she has

2 each of the symptoms required to meet the criteria for listing 12.04 or 12.06.  Even if the record does

3 contain evidence of some of these symptoms, there is no evidence that the symptoms are sufficiently

4 severe to meet the listing requirements.  In order to meet the listing requirements, the severity of

5 symptoms exhibited must be so extreme as to constitute disability per se without regard to any

6 further consideration of a claimant's age, education, or work experience.  *Young v. Sullivan*, 911

7 F.2d 180, 183 (9th Cir. 1990).  An ALJ should not consider a claimant's impairment to be one that

8 meets or equals the listings solely because claimant has a diagnosis of a listed impairment.  20

9 C.F.R. §§ 404.1525(d), 416.925(d); *Key v. Heckler*, 754 F.2d 1545, 1549-50 (9th Cir. 1985).

10 Plaintiff has failed to show that she meets all the criteria in either listing.

11     **4.  ALJ's hypothetical questions to vocational expert were adequate**

12      Plaintiff argues that the ALJ's hypotheticals to the vocational expert were incomplete,

13 because they never mentioned the lifting and carrying restrictions imposed by Drs. Sidrick and

14 Grisolia, and physician's assistant Tuan Le.  (Pl.'s Mem. 41.)

15      "Hypothetical questions posed to the vocational expert must set out all the limitations and

16 restrictions of the particular claimant, including, for example, pain and an inability to lift certain

17 weights."  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) (emphasis in original).  "The ALJ's

18 depiction of the claimant's disability must be accurate, detailed, and supported by the medical

19 record."  Desrosiers, 846 F.2d at 578 (Pregerson, J., concurring).  However, hypothetical questions

20 need only include medical assumptions based on substantial evidence.  *Osenbrock v. Apfel*, 240 F.3d

21 1157, 1163 (9th Cir. 2001); *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995).  "This is true even

22 where there is conflicting medical evidence."  *Roberts*, 66 F.3d at 184.  The ALJ must have specific

23 and legitimate reasons for not including certain limitations in a hypothetical.  *See Embrey*, 849 F.2d

24 at 423.

25      In this case, of the two hypotheticals presented to the vocational expert encompassed

26 limitations that the ALJ properly determined were supported by substantial evidence.  Although the

27 ALJ did not include the lifting and carrying restrictions imposed by Drs. Sidrick and Grisolia, the

28 ALJ is free to accept or reject those limitations as long as his conclusions are supported by

1   substantial evidence.  *See Roberts*, 66 F.3d at 184.  The ALJ articulated a number of specific and

2   legitimate reasons for discrediting the opinions of Drs. Sidrick and Grisolia, and Tuan Le is not an

3   acceptable medical source.  As such, the ALJ properly rejected the limitations they imposed, and he

4   did not have to include those limitations in the hypotheticals to the vocational expert.  Therefore, the

5   vocational expert's opinions had evidentiary value, and the ALJ properly relied on her testimony to

6   establish that Plaintiff could perform jobs in the national economy.  Based on the Court's review of

7   the record as a whole, the ALJ met his burden of demonstrating that Plaintiff was capable of

8   performing jobs that exist in substantial numbers in the national economy.

9          **5.  ALJ properly found Plaintiff was not disabled due to a combination of impairments**

10         Plaintiff argues that she is disabled due to a combination of impairments.  (Pl.'s Mem. 40.)

11  She bases her contention largely on her own testimony and the opinions of various physicians.  As

12  previously discussed, however, the ALJ properly evaluated the evidence in the record and found

13  Plaintiff's testimony was not completely credible.  In addition, because many of her physician's

14  opinions were based on Plaintiff's own subjective testimony and because their opinions conflicted

15  with substantial evidence in the record, the ALJ also properly discredited the opinions of her

16  physicians.

17         Plaintiff argues that she suffers from depression and post-traumatic stress disorder, asthma,

18  osteoarthritis and severe discogenic disease of the spine with chronic knee and back pain.  While the

19  ALJ did find that Plaintiff had depression, Dr. Zappone's "medication management reports" also

20  indicated that in 2003 and 2004, Plaintiff reported she was improving with medication.  (AR at

21  483-87 & 556.)  The ALJ did not believe Plaintiff's claim that she had post-traumatic stress disorder,

22  because her claims were largely inconsistent, and because Plaintiff did work for two years shortly

23  after she arrived in the United States from Cambodia.  Finally, the ALJ did not believe that

24  Plaintiff's physical ailments rendered her completely disabled, because she was able to manage her

25  household of seven people, and the record as a whole indicated that her treatment had been fairly

26  conservation despite her allegations of debilitating pain.

27         Dr. Soliman believed Plaintiff's mental symptoms were treatable and manageable with

28  appropriate outpatient psychiatric treatment.  Dr. Rivera-Miya believed Plaintiff could sustain simple

repetitive tasks with adequate pace and persistence, and she could adapt and relate to co-workers, but she could not work with the public.  Dr. Spellman believed Plaintiff had some environmental limitations due to her asthma, but she could sit for a total of six hours in an eight-hour workday with normal breaks.  Giving Plaintiff the maximum reasonable benefit of the doubt, the ALJ assessed more limiting functional restrictions than these doctors.  He limited Plaintiff to light, rather than medium work and added psychiatric limitations against close or frequent interpersonal contact with supervisors or co-workers.  (AR at 37.)  Based on the vocational expert's testimony, the ALJ found that with those limitations, there was work that Plaintiff could do that existed in substantial numbers in the local and national economy.  The ALJ properly weighed the evidence to find that Plaintiff was not disabled under the Act.

### V.  Conclusion

After a thorough review of the record and the papers submitted and based on the reasons set forth above, this Court finds the ALJ's decision was supported by substantial evidence in the record and was not based on legal error.   Accordingly, this Court **RECOMMENDS** Plaintiff's motion for reversal be **DENIED** and the Commissioner's cross-motion for summary judgment be **GRANTED**.

This Report and Recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties on or before **July 23, 2007**.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be filed and served no later than 10 days after being served with the Objections.

**IT IS SO ORDERED.**

DATED:  July 9, 2007

_____
**CATHY ANN BENCIVENGO**
United States Magistrate Judge

06cv0528